CRAIG A. NEWBY, ESQ. (NV #8591)
LAURA R. JACOBSEN (NV #13699)
McDONALD CARANO LLP
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
Facsimile: (702) 873-9966
cnewby@mcdonaldcarano.com
ljacobsen@mcdonaldcarano.com

*Attorneys for Plaintiff*
*The W.W. Williams Company, LLC*

## IN THE UNITED STATES DISCTRICT COURT

## DISTRICT OF NEVADA

* * * * *

THE W.W. WILLIAMS COMPANY, LLC, a Delaware limited liability company,

                Plaintiff,

v.

JOSEPH REZA, an individual; and TOTAL CARE MAINTENANCE, LLC, a Nevada limited liability company; DOES 1 through 10

                Defendants.

Case No.:  2:17-cv-01410

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff The W.W. Williams Company, LLC ("Williams"), pursuant to Federal Rule of Civil Procedure ("FRCP") 65, 18 U.S.C. § 1836(b)(3), and NRS 600.040, seeks a temporary restraining order enjoining Defendants Joseph Reza ("Reza") and Total Care Maintenance, LLC ("TCM"). Defendants have used Williams' trade secret confidential information to interfere with Williams' prospective and existing customer relationships, in violation of federal and Nevada law. By this motion, Williams seeks a temporary restraining order to stop further violations and to recover Williams' misappropriated confidential information from Defendants.

This Motion is based upon the following memorandum of points and authorities, the exhibits hereto, the concurrently-filed declarations David P. Ruff, Steve Gale, Tim Killian, Eric

Boyette, and Laura R. Jacobsen, the pleadings and papers on file herein, and such other evidence and argument as the Court may allow.

MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Williams recently discovered that Joseph Reza, its former Generator Services Supervisor, has used Williams' trade secret and confidential information to solicit Williams' customers.  In fact, the day he abruptly resigned from employment with Williams, Reza formed a new company, Defendant Total Care Maintenance, LLC ("TCM") to unfairly compete with Williams using Williams' own confidential information.  A month after Reza's resignation, Defendants successfully lured away Williams' lead technician to join with TCM, violating non-solicitation requirements.  Defendants' actions violate state and federal trade secret statutory law, Nevada common law, and Reza's contract with Williams.

Williams is likely to succeed on the merits of its claims.  Defendants have solicited existing Williams customers using Williams' confidential customer information, systematically undercutting Williams' confidential pricing.  Defendants solicited Williams' former employee to quit and work for TCM.  Damages alone cannot compensate Williams for Defendants' misappropriation of trade secrets.

Williams faces irreparable harm unless Defendants are restrained from using Williams' confidential information and soliciting Williams' customers.  In similar situations, courts readily determine that harm caused by disclosure and use of confidential information is irreparable.  Similarly, the damage caused to Williams' goodwill and relationships with its customers is largely immeasurable.  Defendants' failure to cease and desist their misconduct despite Williams' multiple requests demonstrates that further irreparable harm is imminent.  Williams will be further irreparably harmed if the Court permits Defendants to continue to unfairly compete with Williams, using Williams' information against it.

The balance of hardships and the public interest also favor Williams.  Confidential and trade secret business information is worthy of protection as a matter of public policy, and Defendants have been put on notice of their unlawful conduct.  Reza contractually agreed not to

solicit Williams' employees or customers, not to use or disclose Williams' confidential and trade secret information, and not to directly compete with Williams for a period of 18 months. Thus, Reza bargained for, and obtained valuable consideration for, any hardship he would suffer by enforcement of his contract. Regardless of the contract, Defendants' use of Williams' information is unlawful. The public has a significant interest in the enforcement of contracts and the protection of confidential and trade secret business information.

Considering all relevant factors, this Court should issue an order restraining Defendants from further misconduct, including but not limited to, use and disclosure of Williams' confidential and trade secret information, further breaches of Reza's contract with Williams, solicitation of Williams' customers, and solicitation of Williams' employees. Williams further requests that the Court require Defendants to return Williams' confidential information and certify destruction of all copies thereof.

## II.    STATEMENT OF FACTS

### A.    Reza's Employment at Williams

Williams is a leading distributor of diesel-power products and provider of maintenance and repair services for those products, operating over 30 service centers throughout North America, including Las Vegas, Nevada. (Decl. of David P. Ruff ("Ruff Decl.") ¶ 4.) The Las Vegas service center primarily provides services for diesel engines – produced by manufacturers including MTU Friedrichshafen ("MTU") and John Deere, among others – used in power generation and over the road trucking. (*Id.*; Decl. of Lorne Fielitz ("Fielitz Decl.") ¶ 3.)

Williams hired Reza as its Generator Service Supervisor for the Las Vegas service center on or about December 11, 2013. (*Id.* ¶ 4.) In his role as the Generator Service Supervisor, Reza's primary job duties included coordinating technicians to provide services to Williams' customers pursuant to service agreements, ensuring technician training and performance of their duties, processing customer billing and invoicing, and managing the service relationships with Williams' customers. (*Id.* ¶ 5; Decl. of Eric Boyette ("Boyette Decl.") ¶ 3.) As such, Reza gained access to Williams' trade secret and confidential information, including non-public customer contact information, generator specifications (make, model, and serial number) necessary for pricing

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

services and servicing those generators, customer service history, and special pricing terms that Williams offered to certain customers, as set forth herein.

Reza's job required that he work closely with the Las Vegas service center's Service Account Manager, Tim Killian ("Mr. Killian"), who managed the sales aspects of the service agreements with Williams' customers.  (*Id.* ¶ 4; Fielitz Decl. ¶ 6; Killian Decl. ¶ 5.)  Mr. Killian's primary job duties include selling Williams' services, negotiating and signing customers to service agreements, and maintaining customer relationships. (*Id.* ¶ 3.)  Over the course of over six years of employment with Williams, Mr. Killian developed and recorded a wealth of confidential client information which he maintained in electronic format on a flash drive.  This information includes non-public customer contact information, special pricing information (for maintenance of each type of generator, regular and overtime technician labor, and mileage), customer service history, and specifications regarding the make, model, serial number, and location of the generators utilized by each client and serviced by Williams.  (*Id.* ¶ 4; Boyette Decl. ¶ 6.)  The generator information has been collected from each individual generator, and is the basis of Williams' pricing information for service of those generators. (*Id.* ¶ 9: Killian Decl. ¶ 7.)  Mr. Killian backed up this information on his personal password-protected work computer, but did not save it to Williams' network to which other employees have access.  (*Id.* ¶ 12; *see also* Boyette Decl. ¶ 7.)

The database developed by Mr. Killian also contains each bid he submitted for Williams to public entities, most of bids successful.  (Killian Decl. ¶ 10.)  It also contains spreadsheets elaborating Mr. Killian's successful method for calculating Williams' bids for these projects, a method Mr. Killian has developed over the years during his employment.  (*Id.* ¶ 11.)  This information was not developed by anyone else other than Mr. Killian.

To carry out their respective duties, Mr. Killian needed to share the data on the flash drive with Reza in his capacity as Service Account Manager, as Reza was charged with coordinating service to Williams' clients and billing them for those services.  (*Id.* ¶¶ 5-6.)  Accordingly, and only after Reza had completed his 90-day probationary period as a new Williams employee, Mr. Killian created a duplicate of Williams' information and provided it to Reza on a separate flash drive.  (*Id.* ¶ 6.) During Reza's employment, Mr. Killian and Reza were the only two Williams'

employees with access to this data. (*Id.*)  Currently, only Mr. Killian and Reza's replacement, the new Service Account Manager, Eric Boyette ("Mr. Boyette"), have access to this information. (*Id.* ¶ 13; Boyette Decl. ¶ 7; Fieltz Decl. ¶ 8.)

Williams also maintains some of this information, such as some of the generator information, on its password-protected network.  (*Id.* ¶ 9; Boyette Decl. ¶ 7.)  However, the confidential customer pricing and contact information are not available on the network, but only in the database developed by Mr. Killian.  (*Id.*)  Thus, Mr. Boyette would be unable to perform his duties as the Generator Service Supervisor without the database.  (*Id.*)  Further, only those employees who need access to certain information to perform their job duties are granted access to Williams' network by Williams' corporate IT headquarters.  (Fieltz Decl. ¶ 9; Ruff Decl. ¶ 7.) In other words, this information is shared only on a strictly need-to-know basis.  (*Id.*)

To further protect Williams' confidential and trade secret information, each Las Vegas employee was required to sign a confidentiality agreement.  (*Id.* ¶ 5.)  On October 16, 2015, Reza and Williams entered into a Proprietary Information Protection Agreement ("Agreement").  (*Id.*, Ex. A.)  Pursuant to the Agreement, Reza agreed in pertinent as follows:

> 1.    During my employment with Williams, and for a period of 18 months thereafter, I will not directly or indirectly, on behalf of myself or in conjunction with any other person company or entity:
>
> (a)    raid, hire, solicit, divert or attempt to persuade any employee of Williams or any person who was an employee of Williams at anytime during the 12 months preceding the termination of my employment with Williams to leave the employ of Williams; or interfere with the performance by any such persons of their duties for Williams;
>
> (b)    solicit the business of any customer or supplier of Williams with which I had contact, or about which I learned confidential information at any time during the 24 months preceding the termination of my employment, any entity in competition with Williams, or
>
> (c)    either (i) own (other than less than 5% ownership in a publicly traded company), (ii) manage, (iii) operate, (iv) participate in the ownership, management, operation or control of, or (v) be employed by, in a position similar to my position with Williams during the 24 months preceding the termination of my employment, any entity in competition with Williams.
>
> 2.    After my employment with Williams terminates for any reason, I

will not use, disclose, transfer or publish any Williams' trade secrets or confidential information which includes but is not limited to information not publicly known that is generated, collected by or utilized in the operations of Williams' business and relates to the actual or anticipated business, and I will return such materials and will not retain any originals or copies of such materials.

3.    During my employment with Williams, I will devote my best efforts to the performance of my duties and the advancement of Williams and shall not engage in any other employment, profitable activities, or other pursuits which would cause me to utilize or disclose Williams' confidential information or trade secrets, or reflect adversely on Williams.

(*Id.*)  In consideration, Williams provided Reza with continued at-will employment and a cash payment in the amount of $1,500.00.  (*Id.* ¶ 5.)

On January 11, 2017, Reza abruptly resigned from employment with Williams without prior notice.  (*Id.* ¶ 8; Fieltz Decl. ¶ 11.)  Reza did not and has not returned the flash drive he received from Mr. Killian containing Williams' most sensitive confidential customer information. (Killian Decl. ¶ 6.)

**B.    The Immediate Aftermath of Reza's Resignation**

The same day he resigned from Williams, Williams registered a new limited liability company, Defendant Total Care Maintenance LLC.  According to records downloaded from the Nevada Secretary of State website, TCM's Initial List and Articles of Organization were filed on January 11, 2017, and Reza is listed as TCM's sole officer and manager.  (Decl. of Laura R. Jacobsen ("Jacobsen Decl.") ¶ 11, Ex. A.)

In the wake of Reza's abrupt resignation, Williams discovered that Reza had neglected his job duties during his final months of employment, sabotaging important customer relationships and William's ability to service its customers.  For instance, Williams came to learn that Reza had neglected one of his primary job duties, processing of customer invoices, during the last few months of his employment.  (Fieltz Decl. ¶ 10; Boyette Decl. ¶11.)  In late 2015, Williams tasked Mr. Boyette to assist Reza with the processing of invoices two days per workweek.  (*Id.*)  When Reza resigned, Mr. Boyette realized that the only invoices processed since in or about November 2016 were the invoices Mr. Boyette had processed himself, leading Mr. Boyette to conclude that Reza had performed little to no invoicing work in his final months.  (*Id.*)  Because of Reza's neglect, Williams was unable to close out all customer invoices for 2016.  (Fieltz Decl. ¶ 10.)

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Mr. Boyette also discovered that Reza had failed for months to respond to requests from Williams' largest customer ("Customer E") for copies of their inspection reports. (Boyette Decl. ¶ 12; Killian Decl. ¶ 28.) Between this and other issues created by Reza's poor customer service, Williams was forced to negotiate and accept lower pricing from Customer E to maintain the relationship. (*Id.*; Boyette Decl. 12.)

Williams was forced to negotiate and accept lower pricing from one of its largest customers ("Customer F") to salvage the relationship following Reza's neglect of his service job duties. Specifically, Williams had been unable to respond within its guaranteed 2-hour window to Customer F's calls for portable generators following a windstorm that left Customer F without power. (Killian Decl. ¶ 29; Boyette Decl. ¶ 20.) Mr. Boyette learned that the delay was caused by the fact that the generators were not being maintained with proper equipment to make them ready for immediate launch, and the trailers transporting the generators were not properly connected to Williams' trucks to make them ready for immediate launch. (*Id.* ¶ 21.) It was Reza's duty to maintain the generators and trailers for immediate launch in the event of a customer power outage, and Reza's failure to do so resulted in an inordinate response time well outside the two-hour guarantee, and a dissatisfied customer. (*Id.*) Williams almost lost the account, but Mr. Killian and Mr. Boyette were able to meet with Customer F and salvage the relationship with lower prices, and Mr. Boyette has taken steps to make sure Williams will be ready to respond within 2 hours of a power outage emergency in the future. (*Id.* ¶ 22-23; Killian Decl. ¶ 29.)

Reza also failed to manage his service team and maintain their training credentials. (Boyette Decl. ¶ 14.) Accordingly, at the time of Reza's resignation, only one technician in the Las Vegas service center, Mr. Damien Thornton, was certified to service MTU engines, the primary engine serviced by the service center. (*Id.* ¶ 13; Fielitez Decl. ¶ 13.) In 2016, Reza focused his attention on Mr. Thornton, ensuring that he trained for and obtained several manufacturer certifications while providing all other technicians with very little or no training. (Killian Decl. ¶ 23; Boyette Decl. ¶ 14.) Mr. Thornton was also the only technician certified on the latest John Deere software updates, even though John Deere requires the Las Vegas center to have at least two technicians up-to-date on its software at any given time. (*Id.* ¶ 13.)

Consequently, when Reza lured Mr. Thornton away from Williams in February 2017 to work with him at TCM, Williams was left with no MTU-certified technicians in Las Vegas, requiring Williams to pull in technicians from locations in Arizona to service its MTU customers in Las Vegas, and it had no John Deere certified technicians. (*Id.* ¶ 13; Fielitz Decl. ¶ 13-14.) Mr. Boyette immediately arranged for one of his technicians to obtain MTU training, and that employee became fully certified an able to start up and service MTU products as of May 12, 2017. (Boyette Decl. ¶ 15.) Additionally, two other technicians are in the midst of John Deere training, and both are expected to be fully up-to-date by the end of July 2017. (*Id.*)

**C.**   **Reza Uses Williams' Information to Solicit Williams Customers**

On or about March 9, 2017, Mr. Boyette learned from one of his clients ("Customer A") that Reza had solicited their business, pitching prices just below Williams' prices for servicing Customer A's generators. (*Id.* ¶ 16-17; Killian Decl. ¶ 15.) Customer A forwarded Mr. Boyette an email from Reza to Customer A, attaching a proposed TCM service agreement, TCM's tax form W-9, and TCM's certificate of insurance, showing that TCM was insured as of late February 2017. (Boyette Decl. ¶ 18, Ex. A.) The TCM service agreement is identical in form to Williams' service agreements, and contains meta-data showing that it was authored by a Williams employee. (*Id.* 19; Killian Decl. ¶ 16.) As a direct result of Reza's solicitation of Customer A, Williams was forced to quote and accept lower pricing from Customer A to maintain the relationship. (*Id.* ¶ 18; Boyette Decl. ¶ 19.) It is apparent to Williams that Reza used the confidential customer contact information, customer requirements, and pricing terms contained on the flash drive to solicit Customer A. (Killian Decl. ¶ 8.)

On March 13, 2017, Williams sent Reza a cease and desist letter, reminding him of his obligations under the Agreement. (Jacobsen Decl. ¶ 4.) On March 20, 2017, Reza's counsel responded with a refusal to cease and desist. (*Id.* ¶ 5.)

On or about March 21, 2017, Mr. Killian heard from a different customer ("Customer B") that Reza had also solicited their business. (Killian Decl. ¶ 19.) After speaking with Mr. Killian, Customer B forwarded him an email from Reza wherein Reza stated that he no longer worked for Williams "but I would still like to take care of you," and that Williams' "lead tech," Mr. Thornton

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    was working with him.  (*Id.* ¶ 19, Ex. A.)  Reza's email also attached a materially identical TCM

2    service agreement wherein Reza had again quoted pricing terms just below Williams' pricing for

3    Customer B.  (*Id.*)  As a direct result of Reza's solicitation, William was forced to negotiate and

4    accept lower pricing from Customer B to maintain the relationship.  (*Id.* ¶ 20.)

5         On or about March 22, 2017, Mr. Killian contacted one of Williams' largest customers

6    ("Customer C") to determine if they had also been solicited by Reza and/or TCM.  (*Id.* ¶ 24.)

7    Customer C reported that Reza had solicited their business but was unwilling to give further

8    details.  (*Id.*)  As a direct result of Reza's solicitation, Williams was forced to negotiate and accept

9    lower pricing from Customer C to maintain the relationship.  (*Id.* ¶ 26.)  At this time, the extent

10   of the damage to Williams' relationship with Customer C is unknown, as it is unclear whether

11   Customer C contracted with TCM to provide services previously provided by Williams, and

12   Williams dare not further strain the relationship by asking Customer C.  (*Id.* ¶ 25.)

13        On or about March 27, 2017, a fourth customer ("Customer D") reported to Mr. Killian

14   that Reza had solicited their business via email with pricing terms tailored to Customer D's

15   specific generators, indicating again that Reza has and continues to use Williams' confidential

16   information.  (*Id.* ¶ 27.)

17        On April 6, 2017, understanding that Reza had solicited Mr. Thornton away from Williams

18   to work for TCM, Williams sent Reza's counsel an agreement with Williams that Thornton had

19   executed on October 16, 2015 (the "Thornton Agreement").  (Jacobsen Decl. ¶ 6; Ruff Decl. ¶ 6,

20   Ex. B.)  Under the Thornton Agreement, in exchange for continued at-will employment and

21   additional consideration in the amount of $2,500.00, Mr. Thornton agreed that he would not:

22   (a) perform competing work in Clark County, Nevada or Maricopa County, Arizona for a period

23   of twelve months following the termination of his employment with Williams; and (b) not use,

24   disclose, transfer or publish any Williams' trade secret or confidential information.  (Ruff Decl.

25   Ex. 2.)  On April 7, 2017, Reza's counsel reported that Reza and TCM no longer employed Mr.

26   Thornton upon formal notice of the Thornton Agreement.  (Jacobsen Decl. ¶ 7.)

27        On April 10, 2017, and following further investigation of Reza's wrongdoing, Williams

28   again demanded that Reza cease and desist his use and disclosure of Williams' confidential

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

information and competition with Williams in violation of the Agreement and federal and state law.  (*Id.* ¶ 8.)  To date, Reza and his counsel have refused to cease and desist, and has refused to return Williams' confidential information and certify destruction of all copies thereof.  (*Id.* ¶ 9.)

**III.    ARGUMENT**

    **A.    <u>Legal Standard</u>**

FRCP 65 governs the issuance of temporary restraining orders and preliminary injunctions. *See* Fed. R. Civ. P. 65(a), (b).  The same legal standard applies to both temporary restraining orders and preliminary injunctions.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001), *overruled on other grounds, Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  In *Winter*, the Supreme Court set forth the following factors a plaintiff must show in order to obtain injunctive relief: (1) likelihood of success on the merits; (2) likelihood of irreparable harm if preliminary relief is not granted; (3) the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest.  555 U.S. at 20 (citations omitted).  Post-*Winter*, the Ninth Circuit adopted a sliding scale approach, whereby an injunction may issue where the plaintiff has raised "serious questions on the merits," so long as the balance of hardships tips sharply in the plaintiff's favor and the plaintiff satisfies the other two *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

While a request for a mandatory preliminary injunction is subject to a higher degree of scrutiny than a request for a prohibitory preliminary injunction, a court should grant such relief where, as here, the facts and law clearly favor the moving party.  *Malo, Inc. v. Alta Mere Indus, Inc.*, No. 2:06-CV_01449-KJD-GWF, 2007 WL 1703454, at *4 (D. Nev. June 11, 2007) (citing *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

As set forth below, as Williams satisfies all four *Winters* factors, and the facts and law clearly favor Williams, Defendants should be restrained from using or disclosing Williams' confidential information, soliciting Williams' customers, competing with Williams, and should further be required by the Court to return Williams' confidential information and certify that all copies thereof, in whatever form, have been destroyed.

**B.**    **Williams Faces Immediate and Irreparable Harm If a Restraining Order is Not Immediately Issued**

"Disclosure of confidential information or trade secrets creates serious harms which are not readily addressed through payment of economic damages, and are sufficient to meet the irreparably injury requirement for a preliminary injunction." *Finkel v. Cashman Prof'l, Inc.*, --- Nev. ---, 270 P.3d 1259, 1264 (2012) (quoting *Saini v. Int'l Game Tech.*, 434. F. Supp. 2d 913, 919 (D. Nev. 2006) (internal changes and quotation marks omitted)); *see also Aerodynamics Inc. v. Caesars Entm't Operating Co., Inc.*, No. 2:15-cv-01344, 2015 WL 5679843, at *1 (D. Nev. Sept. 24, 2015) (granting temporary restraining order to enjoin breach of confidentiality agreements because disclosure of "'non-trade secret confidential information is a 'serious harm.'") (quoting *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n.1 (9th Cir. 2000)).   In *Saini*, the Honorable Edward C. Reed, Jr. explained why preliminary injunctive relief is ordinarily appropriate to prevent a former employee's use and disclosure of trade secret and non-trade secret confidential information:

> "[D]isclosure of confidential information or trade secrets would create irreparable injury to [the former employer].  Public disclosure of a trade secret destroys in the information's status as a trade secret. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).  This harms the trade secret owned by both depriving him of a property interest, *see id.* At 1002-03, 104 S.Ct. 2862, and by allowing his competitors to reproduce his work without an equivalent investment of time and money. *See Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965).  Disclosure of non-trade secret confidential information is similarly recognized as a serious harm. *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n.1 (9th Cir. 200).  These harms, which are not readily addressed through payment of economic damages, are sufficient to meet the irreparable injury requirement for a preliminary injunction.

*Saini*, 424 F. Supp. 2d at 919. *See also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 112 (3d Cir. 2010) (upholding injunction preventing former employee from working for a competitor because it was likely that the employee would inevitably use or disclose his former employer's confidential information or trade secrets in his new job); *Finkel*, 270 P.3d at 1265 (upholding preliminary injunction issued against former employee to enjoin continued misappropriation of "contracts, customer lists, processed, and prices" and remanding to district court to maintain injunction as long as necessary to eliminate the commercial advantage gained by the competitor); *Frantz v. Johnson*, 116 Nev. 455, 462, 999 P.2d 351, 355-56 (2000) (upholding TRO and

preliminary injunction issued to enjoin former employee from using confidential customer, pricing, and vendor information).  Because secrecy is paramount to their value, the trade secret statutes explicitly authorize injunctions to prevent even threatened misappropriation, among many other types of remedies.  *See* 18 U.S.C. § 1836(b)(3); NRS 600A.040.

Here, Defendants have used Williams' confidential information to unfairly compete with Williams and solicit its customers.  Moreover, Defendants have refused to: (1) return the confidential information and certify destruction of any copies; (2) cease soliciting Williams customers; and (3) cease competing with Williams.  Thus, the threat of further irreparable harm remains imminent.  Without a temporary restraining order, Defendants may continue to use Williams' confidential information to contact Williams' customers, and further damage those relationships and goodwill.  So far, four customers have voluntarily reported to Williams that they have been solicited, but it is likely Defendants have contacted other customers and they have refused to cease doing so.   If not stopped now, Defendants will have gained a foothold in the market and a competitive advantage through unfair competition and misconduct that Williams will be unable to remedy through damages alone.  It is impossible to calculate the value of the harm that will befall Williams if Reza and/or TCM continue to use Williams' confidential information and further attempt to undercut Williams' business and relationships with its customers.  In this case, a temporary restraining order is justified.  *See Protection Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *3 (D. Nev. Mar. 8, 2017) (issuing temporary restraining order to enjoin former employee from using employer's information and soliciting employer's business); *Aerodynamics Inc.*, 2015 WL 5679843, at *12 (issuing temporary restraining order where, as here, the plaintiff presented evidence that the defendants had already attempted to contract with the plaintiff's customers).

C.   **Williams Also Satisfies the Requirement for a Preliminary Injunction**

1.   **Williams is Likely to Succeed on the Merits of its Claims**

Williams' Complaint asserts the following causes of action: (1) Breach of Contract against Reza; (2) Trade Secret Misappropriation in Violation of Nevada's Uniform Trade Secrets Act ("UTSA") against Defendants; (3) Trade Secret Misappropriation in Violation of the federal

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Defend Trade Secrets Act of 2016 ("DTSA") against Defendants; (4) Breach of Fiduciary Duty of Loyalty against Reza; (5) Intentional Interference With Contractual Relations against Defendants; (6) Intentional Interference With Prospective Economic Advantage against Defendants; (7) Conversion against Defendants; (8) Unfair Competition against Defendants; and (9) Injunctive Relief against Defendants.  Williams is likely to succeed on the merits of each of these claims.

### a. Reza's Multiple Breaches of Contract

To prevail on a breach of contract claim against Reza, Williams must show that: (1) there is a valid and existing agreement between Williams and Reza; (2) Williams has performed its obligations under the agreement or was excused from performance; (3) Reza breached the agreement; and (4) Williams has suffered, and will suffer, damages as a result of the breach.  *Nev. Contract Servs., Inc. v. Squirrel Cos.*, 119 Nev. 157, 68 P.3d 896 (2003).

As related above, Reza and Williams entered into a valid and enforceable agreement on or about October 16, 2015, the Agreement.  Williams performed its obligations under the Agreement by providing continued at-will employment, and provided additional consideration in the amount of $1,500.00.  Among other breaches not pertinent to this Motion, the evidence shows that Reza breached the Agreement by: (1) soliciting and hiring former Williams employee Mr. Thornton (Paragraph 1(a)); (2) soliciting the business of at least four Williams customers (Paragraph 1(b)); (3) owning, managing, and operating TCM, an entity in competition with Williams (Paragraph 1(c)); and (4) keeping, failing to return, and using Williams' trade secrets and confidential information (Paragraph 2).  Because Reza has failed to cease and desist, the threat of solicitation of employees, solicitation of customers, operation of a competing entity, and use of Williams' trade secret and confidential information remains.

Williams has already suffered damages (and faces further irreparable harm) as a direct result of these breaches.  Reza's employee solicitation caused Williams to lose its lead (and only MTU- and John Deere-certified) technician, and all the training and resources invested in Mr. Thornton, in February 2017.  Reza has not promised he will not solicit further technicians, and only terminated Mr. Thornton's employment with TCM because of the Thornton Agreement, not

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   because of his own.  Reza's customer solicitation, use of confidential information, refusal to return

2   confidential information, and competition in violation of the Agreement's non-competition

3   covenant has resulted in immeasurable harm to Williams' relationships with at least four of its

4   customers, and lowered revenue from Customers A, B, and C.

5       Accordingly, Williams has established a strong likelihood of success on the merits of its

6   breach of contract claim against Reza.

7           ***b. Defendants' Misappropriation of Williams' Trade Secrets***

8       As the Uniform Trade Secrets Act (codified in NRS Chapter 600A) and the federal Defend

9   Trade Secrets Act statutes are materially identical as to the issues presented here, courts analyze

10  state and federal trade secret misappropriation claims together.  *See, e.g.*, *Protection Techs., Inc.*,

11  2017 WL 923912, at *2-3; *OOO Brunswick Rail Mgmt. v. Sultanov*, Case No. 5:17-cv-00017-

12  EJD, 2017 WL 67119, at *2-3 (N.D. Cal. Jan. 6, 2017).  To prevail on its misappropriation claims,

13  Williams must show: (1) a valuable trade secret; (2) misappropriation of the trade secret through

14  use or disclosure of the trade secret; and (3) that the misappropriation was wrongful because it

15  was made in breach of an express or implied contract or by a party with a duty not to disclose.

16  *Frantz*, 116 Nev. at 466, 999 P.2d at 358.

17      The customer database contained on the flash drive that Reza failed to return to Williams

18  after he resigned employment constitutes a valuable trade secret.  While "not every customer and

19  pricing list will be protected as a trade secret," "customer and pricing information" is a trade secret

20  where it is confidential, its secrecy is guarded, and it is not readily available to others.  *Frantz*,

21  999 P.2d at 359; *see also Prot. Techs., Inc.*, 2017 WL 923912, at *1 (issuing temporary restraining

22  order upon determining that confidential information related to the employer's "customers,

23  products, margins, profit percentages and markets, and the products [its] customers purchased"

24  qualified as trade secrets under the DTSA and Nevada's codification of the UTSA).

25      In a similar case, the Ninth Circuit held that a customer database constituted a trade secret

26  under the UTSA, justifying an injunction to prevent its further dissemination, because it was a

27  "valuable collection of data assembled over many years that allows [the plaintiff] to tailor its

28  service contracts and pricing to the unique needs of its customers" and because the plaintiff "took

1   reasonable steps to insure" its secrecy by "requir[ing] its employees to sign confidentiality
2   agreements". *Mai Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).

3          Here, just like the customer database in *Mai Systems Corp.*, the customer and pricing
4   information contained on the flash drive was developed by Mr. Killian over the course of years of
5   employment with Williams.  The information includes non-public customer contact information,
6   servicing history, generator specifications transcribed from the generators themselves, and special
7   pricing terms for each customer.   This information allows Williams to tailor its service contracts
8   and pricing to the unique needs of its customers. Williams guarded this information by making it
9   available only to those two employees whose access was necessary to perform their job duties,
10  and only after the probationary period was completed.  Indeed, the customer contact information,
11  special pricing terms, and up-to-date generator information are not even available on Williams'
12  password-protected network.   Williams also required its employees to sign confidentiality
13  agreements in exchange for valuable consideration.  Thus, Williams has shown that it is likely to
14  prove that the customer database Reza failed to return constitutes a valuable trade secret.

15         Reza's and TCM's apparent use of Williams' customer information to compete with
16  Williams constitutes wrongful misappropriation.   Misappropriation occurs where a former
17  employee uses a trade secret customer database to solicit customers. *Mai Systems Corp.*, 991 F.3d
18  at 521.  Reza and TCM's quotes to Customers A and B of pricing terms just below those pricing
19  terms contained in Williams' service agreements with Customers A and B are strong
20  circumstantial evidence of Reza and TCM's use of Williams' trade secrets in violation of Reza's
21  contractual obligations.   The TCM service agreements forwarded by Williams' customers,
22  including one that contained Williams' meta-data, is further circumstantial evidence.   In Nevada,
23  circumstantial evidence is sufficient to prove misappropriation, and direct evidence is not required
24  to prove misappropriation even at the final stages of the litigation. *Frantz*, 999 P.2d at 468.

25         Even at this preliminary stage, without the benefit of discovery, Williams already has
26  presented a strong circumstantial case for misappropriation, and is likely to succeed on the merits.
27  As such, a temporary restraining order enjoining further actual or threatened misappropriation is
28  justified.

*c.  Defendants' Intentional Interference with Customer Relationships*

In order to prevail on a claim for intentional interference with contractual relations, Williams must prove: (1) there exists a valid contract between Williams and a third party; (2) Defendants knew of the contract; (3) Defendants committed intentional acts intended or designed to disrupt the contractual relationship; (4) there was an actual disruption of the contract; and (5) Williams sustained damages a result.  *Hilton Hotels Corp. v. Butch Lewis Prods, Inc.*, 10 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993).  Here, Williams can show that Reza had knowledge of Williams' valid contracts with its customers through his employment with Williams, where he provided services and billed customers pursuant to Williams' service agreements.  Williams will also be able to show that Reza also had knowledge of Williams' contract with its former employee, Mr. Thornton, as every Williams employee was required to sign a confidentiality agreement in 2015.  TCM has knowledge of these contracts through its principal, Reza.  Together, Reza and TCM committed intentional acts designed to disrupt Williams' relationship with its customers and with Mr. Thornton when they solicited Williams' customers and Mr. Thornton.  As to Mr. Thornton, Defendants' solicitation was successful, and thereby actual disrupted Williams' contractual relationship with Mr. Thornton and caused damages in the amount of Williams' loss of the resources invested in Mr. Thornton.  So far, Defendants have disrupted four customer relationships with their solicitation, and have caused concrete damages measured in the amount of lost revenue caused by lower prices, and immeasurable damages to those relationships and goodwill.  Accordingly, Williams has established a strong likelihood of success on the merits.

*e.  Defendants' Conversion*

Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion or defiance of such title or rights."  *Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2002).  Despite receiving demand from Williams to return Williams' flash drive containing Williams' confidential customer information, Defendants refuse to return the property.  By this conduct, Defendants have wrongfully exerted control over Williams' property in derogation and defiance of Williams' rights.  Therefore, Williams has shown a likelihood of

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    success on the merits of its claim for conversion.

2                    f.        **Defendants' Unfair Competition**

3         "[T]he tort of unfair competition is extremely flexible and has been defined very

4    broadly[.]" *Custom Teleconnect, Inc. v Int'l Tele-Servs., Inc.*, 254 F. Supp. 2d 1173, 1182 (D. Nev.

5    2003).  A plaintiff need not show that the defendant passed off goods as if from another, only that

6    the competition is grounded in deception or appropriation of the plaintiff's property. *Id.* (citing

7    *Golden Nugget, Inc. v. Am Stock Exch., Inc.*, 828 F.2d 586, 591 (9th Cir. 1987)).  Here, Defendants

8    have misappropriated plaintiff's property, its confidential information and trade secrets, and used

9    it to unfairly compete for Williams' customers.  The evidence presented thus far shows that

10   Williams is likely to succeed on the merits of this claims.

11            **2.        The Balance of Equities Weighs in Williams' Favor**

12        Courts generally find that the balance of equities, sometimes articulated as the balance of

13   hardships, favors the employer in cases of a departing employee using confidential information to

14   assist a competitor and harm his former employer.  *See, e.g. Saini*, 434 F. Supp. 2d 913, 924-25;

15   *Aerodynamics Inc.*, 2015 WL 5679843, at *13 (finding the balance of equities tips in the

16   employer's favor because the plaintiffs had no right to use the employer's information which the

17   employer spent considerable time and resources developing).  "Equity will . . . restrain tortious

18   acts where it is essential to preserve a business or property interest . . . The right to carry on a

19   lawful business without obstruction is a property right, and acts committed without just cause or

20   excuse which interfere with the carrying on of plaintiff's business or destroy its customers, its

21   credit or its profits, do an irreparable injury and thus authorize the issuance of an injunction. *Guion*

22   *v. Terra Mktg. of Nev., Inc.*, 90 Nev. 237, 240, 523 P.2d 847, 848 (1974) (citations omitted).  Here,

23   Defendants have no right to use Williams' information that another employee spent years

24   developing, and are unlawfully interfering with Williams' business and customers.  The harm

25   caused by targeted competition tailored to each of Williams' customers, using Williams'

26   confidential customer information, far outweighs any potential harm to Defendants in not being

27   able to unfairly undercut or compete with Williams in violation of Reza's contractual obligations.

28   Further, Reza agreed to any hardship occasioned by the non-competition covenant contained in

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

the Agreement when he received valuable consideration in exchange for his promises.  Williams

stands to lose its customers, its business, and its profits, while Reza stands to lose only that to

which he is not entitled.  The balance sharply favors Williams.

### 3. Immediate Injunctive Relief Serves the Public's Interest

"[T]here is a strong interest in protecting trade secrets, as evidenced by the existence of

the DTSA and UTSA." *Protection Techs., Inc.*, 2017 WL 923912, at *3.  Even if trade secrets

were not at issue, "there is a public interest in enforcing confidentiality agreements." *Saini*, 434

F. Supp. 2d at 925.  Finally, Nevada public policy dictates the enforcement of reasonable

restrictive covenants to protect legitimate business interests.  *See Jones v. Deeter*, 112 Nev. 291,

913 P.2d 1272 (1996); *Hansen v. Edwards*, 83 Nev. 189, 189, 426 P.2d 792, 792 (1967).

Accordingly, the public interest favors the prohibition of Defendants' wrongful acts detailed

herein.

## IV. CONCLUSION

For the foregoing reasons, Williams respectfully requests that the Court grant this Motion

in its entirety and enter the Proposed Temporary Restraining Order and Order to Show Cause

submitted concurrently herewith as **Exhibit 1**.

Dated: May 18, 2017.

**McDONALD CARANO LLP**


*/s/ Laura R. Jacobsen*
CRAIG A. NEWBY (NV #8591)
LAURA R. JACOBSEN (NV #13699)

*Attorneys for Plaintiff*
*The W.W. Williams Company, LLC*

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO